# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONALEFT, INC., a California corporation,<br><br>                            Plaintiff,<br>   vs.<br>CHECKGATEWAY, L.L.C., an Arizona Limited Liability Company; JOHN KIRCHHEFER, an individual; BRIAN BONFIGLIO, an individual; and DOES 1 through 50, inclusive,<br><br>                            Defendants. | CASE NO. 12cv1498-WQH-JMA<br><br>ORDER |

HAYES, Judge:

      The matter before the Court is the Motion to Dismiss the First Amended Complaint Under Rules 12(b)(2), 12(b)(3) and 12(b)(6) and, Alternatively, Motion to Transfer Venue ("Motion to Dismiss"). (ECF No. 15).

**I.    Background**

      On June 19, 2012, Plaintiff NationalEFT, Inc. initiated this action by filing a Complaint against Defendants Checkgateway, L.L.C., John Kirchhefer and Brian Bonfiglio. (ECF No. 1).

      On August 10, 2012, all Defendants jointly filed a motion to dismiss, or, alternatively, transfer venue. (ECF No. 12). Defendants contended, inter alia, that the Complaint should be dismissed because the Court does not have personal jurisdiction over Defendants.


On September 4, 2012, Plaintiff filed a First Amended Complaint. (ECF No. 13).

**A.     Allegations of the First Amended Complaint**

Plaintiff is a California corporation with its principal place of business in San Diego, California. *Id.* ¶ 1. Defendant Checkgateway has its principal place of business in Maricopa County, Arizona, "doing business in all states including in the State of California, and the successor in interest to First American Payment Processing, Inc." *Id.* ¶ 2. Defendants Kirchhefer and Bonfiglio are employees of Checkgateway with principal places of residence in Maricopa County, Arizona. *Id.* ¶¶ 4-5, 7.

Checkgateway "is an Automated Clearing House (ACH) that processes electronic payments or the electronic movement of funds from one entity or person to another ('ACH transactions')." *Id.* ¶ 8. "ACH transactions are used for credit and debit payments, direct deposit payroll, and other common payments. Both the government and private businesses (both hereafter referred to as 'Merchants') use ACH transactions." *Id.* ¶ 9. "The ACH transactions serviced by [Checkgateway] originate when a consumer makes a credit or debit card payment to a Merchant.... The Merchant, directly or through accounting software, electronically sends the transaction data to [Checkgateway] to facilitate the transfer of money from the consumer's [bank] to the Merchant." *Id.* ¶ 11. Checkgateway "charges Merchants fees for payment processing and authentication services." *Id.* ¶ 13.

"Most Merchants do not have the time, skill, market knowledge, or desire to shop or negotiate ACH services.... Such Merchants utilize the services of consultants (Merchant Consultants) to assist Merchants in the development and management of their electronic payment systems." *Id.* ¶ 15. Checkgateway "relies on Merchant Consultants (called ISO's by [Checkgateway]) for over 90% of its business.... In exchange for these referrals, [Checkgateway] agrees to pay transaction based fees and commissions to the Merchant Consultant." *Id.* ¶ 16.

In March 2002, Plaintiff was a Merchant Consultant doing business in San Diego, California. *Id.* ¶ 19. Beginning in March 2002, Checkgateway directly solicited Plaintiff via e-mail to "court Plaintiff to purchase its services and become an ISO for" Checkgateway. *Id.*

1 ¶ 21. "Plaintiff began using [Checkgateway]'s services in December of 2002." *Id*.

2  Checkgateway "engaged substantial, continuous and systematic activities within the State of California," including: Checkgateway "contracted for and conducted continuous and long term ACH service activities with California based Merchants and Merchant Consultants, including but not limited to Plaintiff"; Checkgateway "provided ACH transaction services to consumers, Merchants and Merchant Consultants on ACH transactions originating throughout California"; Checkgateway "actively and directly solicited California Merchants and Merchants Consultants including but not limited to Plaintiff, via a webpage, through a direct e-mail, telephone contact, trade publications and regular attendance at trade shows and conventions in California where CGW make direct, fact-to-face contact with California Merchants and Merchants Consultants including but not limited to Plaintiff"; and Checkgateway "maintained a secure online active website accessed from and relied upon by California Merchants and Merchant Consultants, including Plaintiff to conduct and monitor business with [Checkgateway]." *Id*. ¶ 22.

The First Amended Complaint alleges 20 claims for fraud, tortious interference with prospective economic advantage, conversion, breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing. The claims allege that Checkgateway improperly failed to pay or underpaid commissions for two named merchants ("Blue Hippo" and "EFTCanada") and other unnamed merchants in violation of the contract between Plaintiff and Checkgateway. *Id*. ¶¶ 83-88, 145-49. The First Amended Complaint alleges that Checkgateway "open[ed] separate House Account(s) for [merchants referred by Plaintiff or Plaintiff's 'sub-agents'] through which [Checkgateway] would process [merchant] transactions separate from [Checkgateway]'s referral agreement with Plaintiff and without accounting or payment to Plaintiff." *Id*. ¶ 32. The First Amended Complaint requests compensatory and punitive damages.

**B. Motion to Dismiss**

On September 21, 2012, Defendants filed the Motion to Dismiss on the following grounds: (1) this Court lacks personal jurisdiction over all Defendants; (2) venue is improper

1  in this District; (3) "all of [Plaintiff]'s tort claims are barred by the economic loss rule";
2  Plaintiff's "claim for intentional interference with prospective economic advantage fails to
3  state a claim because [Plaintiff] has not alleged an independent contractual relationship with
4  a third party"; Plaintiff's "claim for negligent misrepresentation against the Individual
5  Defendants fails to state a claim because the Individual Defendants owe no independent duty
6  to [Plaintiff]"; Plaintiff's "request for punitive damages fails because none of its tort claims
7  survives dismissal and California law prohibits the recovery of punitive damages for claims
8  arising out of a contract"; and, "[a]ny claims that survive dismissal should be transferred to the
9  District of Arizona pursuant to 28 U.S.C. § 1404(a)." (ECF No. 15-1 at 6). In support of the
10 Motion to Dismiss, Defendants submitted declarations from Kirchhefer and Bonfiglio, and a
11 copy of the contract between Plaintiff and Checkgateway. (ECF Nos. 15-2, 15-3, 17-1).

12      On October 15, 2012, Plaintiff filed an opposition to the Motion to Dismiss, including
13 a declaration from Plaintiff's president, Donald Cook. (ECF No. 16).

14      **C.      Evidence Submitted by the Parties**

15      Checkgateway is incorporated under the laws of the State of Arizona. (Kirchhefer Decl.
16 ¶ 5, ECF No. 15-2). Checkgateway's principal, and only, place of business is located in
17 Maricopa County, Arizona. *Id*. ¶ 6. Checkgateway does not own any real or personal property
18 in California, maintain any offices in California, maintain a local telephone number in
19 California, have a designated agent for the service of process in California, maintain any bank
20 or other deposit accounts within California, or pay taxes within California. *Id*. ¶¶ 7-12.
21 Checkgateway "does not target any print, television, or radio advertising specifically toward
22 the State of California." *Id*. ¶ 13. "Checkgateway rarely attends trade shows in California.
23 In the past 8 years, Checkgateway has attended approximately 4 trade shows in the state.
24 These tradeshows were not based in California, but instead were traveling trade shows that
25 toured throughout the country." *Id*. ¶ 34.

26      Kirchhefer and Bonfiglio each stated that they have never been a resident of California,
27 employed in California, paid income taxes in California, owned any real or personal property
28 in California, maintained a bank or other deposit account within California, regularly traveled

to California, or personally entered into a contract with a resident of California. *Id.* ¶¶ 22-25, 28, 30; Bonfiglio Decl. ¶¶ 19-23, 25, 27, ECF No. 15-3. Kirchhefer and Bonfiglio each stated that they "have never visited the State of California in order to conduct business with [Plaintiff], or in relation to the ISO Agreement [with Plaintiff]," and "[w]ith the exception of the present suit, [they] have never sued or been sued personally in the State of California." (Kirchhefer Decl. ¶¶ 27, 29, ECF No. 15-2; Bonfiglio Decl. ¶¶ 24, 26, ECF No. 15-3).

"In 2002, Checkgateway, through its predecessor First American Payment Processing, Inc. ('First American'), negotiated a merchant reseller/Independent Services Organization ('ISO') agreement with [Plaintiff] NationalEFT, Inc. (the 'ISO Agreement')." (Kirchhefer Decl. ¶ 14, ECF No. 15-2). Donald Cook, President of Plaintiff, stated: "Throughout the negotiation and at the time I accepted and signed [Checkgateway]'s ISO Agreement, I was in San Diego. [Checkgateway] and its employees and officers contacted me here and sent the proposed ISO Agreement to me here in San Diego. I did not make any counter-offers or demands at the time I accepted and agreed to the terms of the ISO Agreement." (Cook Decl. ¶ 7, ECF No. 16-1). Kirchhefer stated: "The ISO Agreement was executed on December 6, 2002 when I signed it in the State of Arizona in my capacity as the National Sales Manager on behalf of First American.... I signed the ISO Agreement after Don Cook, President of [Plaintiff], had already signed the document on behalf of [Plaintiff]." (Kirchhefer Decl. ¶¶ 17-18, ECF No. 15-2). Kirchhefer and Bonfiglio stated that "the ISO Agreement (and any other agreement that may exist between First American or Checkgateway and [Plaintiff]) was negotiated over the telephone and/or by the exchange of drafts via facsimile or other electronic means such as email." *Id.* ¶ 15; Bonfiglio Decl. ¶ 15, ECF No. 15-3. Kirchhefer and Bonfiglio stated that "no First American or Checkgateway employee has ever traveled to the State of California in order to meet with [Plaintiff] related to the ISO Agreement, whether negotiating or performing the Agreement." (Kirchhefer Decl. ¶ 16, ECF No. 15-2; Bonfiglio Decl. ¶ 16, ECF No. 15-3).

"Of the approximately 8,000 merchants Checkgateway has ever contracted with since its inception (including its predecessor, First American), only approximately 10% have ever

been located in California." (Suppl. Bonfiglio Decl. ¶ 4; ECF No. 17-1). "Checkgateway does not directly access consumer bank accounts in California (or any other state)." *Id.* ¶ 5. "Checkgateway presently has contracts with 40 ISOs. Other than [Plaintiff], only four of these ISOs are located in California." *Id.* ¶ 6. Bonfiglio stated that "none of the merchants upon which [Plaintiff] bases its complaint, Blue Hippo, Legal Club, and EFT Canada, is located in California." *Id.* ¶ 7.

## II.    Personal Jurisdiction

Defendants move to dismiss this action for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). "In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (citation omitted). In the absence of an evidentiary hearing, "the plaintiff need only make a prima facie showing of the jurisdictional facts." *Id.* (quotation omitted). "The plaintiff cannot simply rest on the bare allegations of its complaint, but uncontroverted allegations in the complaint must be taken as true. We may not assume the truth of allegations in a pleading which are contradicted by affidavit, but we resolve factual disputes in the plaintiff's favor." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011) (quotations omitted).

The exercise of personal jurisdiction over a nonresident defendant must be authorized under the state's long-arm statute and must satisfy the due process clause of the United States Constitution. *See Pac. Atl. Trading Co. v. M/V Main Express*, 758 F.2d 1325, 1327 (9th Cir. 1985). "California's long-arm statute is co-extensive with federal standards, so a federal court may exercise personal jurisdiction if doing so comports with federal constitutional due process." *Boschetto*, 539 F.3d at 1015; *see also* Cal. Civ. Pro. Code § 410.10. "For a court to exercise personal jurisdiction over a nonresident defendant consistent with due process, that defendant must have 'certain minimum contacts' with the relevant forum 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *CollegeSource*, 653 F.3d at 1073 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1954)). Under due process analysis, a defendant may be subject to either general or specific

1 personal jurisdiction. *See Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414 (1984).

### A.    General Jurisdiction

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, --- U.S. ---, 131 S. Ct. 2846, 2851 (2011). "For general jurisdiction to exist over a nonresident defendant..., the defendant must engage in 'continuous and systematic general business contacts,' that approximate physical presence in the forum state." *CollegeSource*, 653 F.3d at 1073 (quoting *Helicopteros*, 466 U.S. at 416). "The standard is met only by continuous corporate operations within a state that are thought so substantial and of such a nature as to justify suit against the defendant on causes of action arising from dealings entirely distinct from those activities." *Id.* (quotation omitted). "To determine whether a nonresident defendant's contacts are sufficiently substantial, continuous, and systematic, we consider their '[l]ongevity, continuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets.'" *Id.* (quoting *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1172 (9th Cir. 2006)). "The standard for general jurisdiction is an exacting standard, as it should be, because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world." *Id.* (quotation omitted).

Defendants contend that "Checkgateway is a small, Arizona-based company. Although the Internet enables Checkgateway to serve merchants nationwide (in the same way it allows [Plaintiff] to serve merchants nationwide), Defendants simply do not have the kind of continuous and systematic contact with California necessary to subject them to general personal jurisdiction in the state." (ECF No. 17 at 2).

Plaintiff contends that Checkgateway "is directly involved in millions of California based merchant/consumer transactions in business establishments in California and derives its income from these transactions. These services also constitute continuous and systematic

business contacts with California." (ECF No. 16 at 9). Plaintiff contends that "ACH transaction companies like [Checkgateway] are woven into the fabric of California's economy and reap millions if not billions of dollars of profit from the State's merchants and consumers on an annual basis. Given the nature and scope of their relationship to this state, such companies can and should reasonably expect to be haled into court here." *Id*. at 10.

"The Supreme Court has found general personal jurisdiction over a non-resident defendant in only one case." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1224 (9th Cir. 2011) (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952)). "The facts of *Perkins* illustrate the nature and extent of the contacts required for general jurisdiction." *Id*. In *Perkins*, the defendant was a Philippine corporation whose mining operations were suspended while the Japanese occupied the Philippines during World War II. *See Perkins*, 342 U.S. at 447. The corporation's president, who was also its general manager and principal stockholder, returned to his home in Ohio, where he ran a corporate office. *See id*. The president kept business files in Ohio; handled corporate correspondence from Ohio; drew employees' salaries from accounts in Ohio banks and distributed paychecks; held directors' meetings while he was in Ohio; and "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company." *Id*. at 448. The Court therefore upheld the exercise of personal jurisdiction over the corporation in Ohio. *Id*.

In *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163 (9th Cir. 2006), the Court of Appeals for the Ninth Circuit found that general personal jurisdiction existed in Washington over a North Carolina cigarette company that had been licensed to do business in the state for more than 60 years, had advertised in purely local publications for more than 50 years, kept a permanent office and workforce in-state, engaged in local political activity, had made "hundreds of millions of dollars in annual net sales in recent years" in the state, and whose "market share in Washington was 29-31%, while its national market share was 23-24%." *Id*. at 1167, 1173.

By contrast, in *CollegeSource*, the Ninth Circuit held that an out-of-state corporation was not subject to general personal jurisdiction in California despite evidence and allegations

that the corporation "misappropriated [plaintiff]'s catalogs and course descriptions in California; markets its services to California students and educational institutions; has three hundred registered users and two paid subscribers in California; and maintains a highly interactive website." *CollegeSource*, 653 F.3d at 1074. In *Shute v. Carnival Cruise Lines*, 897 F.2d 377 (9th Cir. 1990), reversed on other grounds by *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), the Ninth Circuit held that no general jurisdiction existed in Washington over Carnival Cruise Lines, and stated: "Its contacts [in Washington] are limited to advertising in the local media, the mailing of brochures and the payment of commissions to travel agents, the conducting of promotional seminars, and the sale of its vacation cruises to residents of Washington." *Shute*, 897 F.2d at 381. In *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421 (7th Cir. 2010), the court held that no general jurisdiction existed in Illinois over an Arizona company despite "extensive and deliberate" contacts, including extensive nationwide and local advertising, entering into contracts with many Illinois residents, hosting of websites accessible from Illinois, and "Illinois customers in the hundreds of thousands, [who] delivered many millions of dollars in revenue to GoDaddy [per] year." *Id*. at 424, 426; *see also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 772, 779 & n.11 (1984) (no general jurisdiction despite circulation of 10,000-15,000 copies of nonresident defendant's magazine in forum per month); *Scott v. Breeland*, 792 F.2d 925, 928 (9th Cir. 1986) ("systematic" sale of records in California by the Oak Ridge Boys, a country music band from Tennessee, as well as "the occasional music performance" in California, insufficient to confer general jurisdiction).

Based upon the uncontradicted allegations of the First Amended Complaint and the evidence presented by the parties, over the course of the company's existence, Checkgateway solicited and contracted with approximately 1,000 California merchants to provide services to facilitate California-based ACH transactions. Checkgateway currently has contracts with four California-based ISOs other than Plaintiff. Checkgateway attended four traveling trade shows in California during the past eight years. These contacts are not as systemic, deliberate and extensive as the contacts which have been found sufficient to confer general jurisdiction in *Perkins* and *Tuazon*. Instead, Checkgateway's contacts are similar to, or less than, the contacts

1 found insufficient to confer general jurisdiction in *Shute*, *Keeton* and *Scott*. *See also Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000) ("[E]ngaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within the state's borders."). The Court finds that Plaintiff has failed to make a prima facie showing of the jurisdictional facts necessary to show that this Court has general personal jurisdiction over Checkgateway.[1]

**B.     Specific Jurisdiction**

A court exercises specific personal jurisdiction over a defendant where "the cause of action arises out of or has a substantial connection to the defendant's contacts with the forum." *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1123 (9th Cir. 2002) (citation omitted). The Ninth Circuit analyzes specific jurisdiction according to a three-prong test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Boschetto*, 539 F.3d at 1016 (quotation omitted). "The plaintiff bears the burden on the first two prongs. If the plaintiff establishes both prongs one and two, the defendant must come forward with a compelling case that the exercise of jurisdiction would not be reasonable. But if the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be dismissed." *Id.* (quotation omitted).

"Under the first prong of our three-part specific jurisdiction test, [plaintiff] must establish that [defendant] either purposefully availed itself of the privilege of conducting activities in California, or purposefully directed its activities toward California.... [A]vailment and direction are ... two distinct concepts. A purposeful availment analysis is most often used

---

[1] Plaintiff does not contend that general personal jurisdiction exists over the individual Defendants.

in suits sounding in contract.  A purposeful direction analysis, on the other hand, is most often used in suits sounding in tort." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  "Whether an action is based on contract or tort depends upon the nature of the right sued upon, not the form of the pleading or relief demanded.  If based on breach of promise it is contractual; if based on breach of a noncontractual duty it is tortious.  If unclear the action will be considered based on contract rather than tort." *Amtower v. Photon Dynamics, Inc.*, 158 Cal. App. 4th 1582, 1602 (2008); *see also Rains v. Criterion Sys., Inc.*, 80 F.3d 339, 343 n.2 (9th Cir. 1996) ("The label that a plaintiff places on his pleadings, however, does not determine the nature of his cause of action.").  In *Boschetto*, the Court of Appeals for the Ninth Circuit held that a complaint related to the sale of an automobile which alleged state law causes of action for violation of the California Consumer Protection Act, breach of contract, misrepresentation, and fraud "sound[s] primarily in contract" and should be "analyzed ... under a purposeful availment standard." *Boschetto*, 539 F.3d at 1016. Similarly, while the First Amended Complaint alleges both breach of contract and tort claims, each of the claims are premised on Defendants' alleged broken contractual promises (ECF No. 13 ¶¶ 26-28, 30, 154), and for each of the claims, the First Amended Complaint alleges that Plaintiff was damaged in the form of lost "transactional fees, monthly fees, commissions and other income, including but not limited to the Agreed Upon Fees and Commissions" and the "Sub-Agent Agreed Fees and Commissions." *Id*. at ¶¶ 37, 46, 58, 68, 73, 79, 88, 97, 106, 115, 124, 134, 142, 149 163, 172, 181, 190, 191, 200 205.  The Court finds that the First Amended Complaint sounds primarily in contract and should be analyzed under a purposeful availment standard.[2]  *See Boschetto*, 539 F.3d at 1016.

"To have purposefully availed itself of the privilege of doing business in the forum, a defendant must have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state. Our evaluation of the jurisdictional significance of a defendant's contract or other business in the forum is not rigid and

---

[2] The Court makes no finding or ruling as to Defendants' contention that "[b]ecause all of [Plaintiff]'s claims arise in contract, tort recovery is unavailable" by operation of the economic loss rule.  (ECF No. 15-1 at 18).

1  formalistic, but rather practical and pragmatic." *Id.* (quotation omitted). "The first step of the
2  [purposeful availment] specific jurisdiction analysis involves a qualitative evaluation of the
3  defendant's contact with the forum state.... Th[e] purposeful availment requirement is the test
4  for the fundamental determination of whether 'the defendant's conduct and connection with
5  the forum State are such that he should reasonably anticipate being haled into court there.'"
6  *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987) (quoting *World-Wide Volkswagen Corp. v.*
7  *Woodson*, 444 U.S. 286, 297 (1980)). In applying purposeful availment standard, "we are
8  guided by the Supreme Court's admonition that the formation of a contract with a nonresident
9  defendant is not, standing alone, sufficient to create jurisdiction." *Boschetto*, 539 F.3d at 1017
10 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("If the question is whether
11 an individual's contract with an out-of-state party *alone* can automatically establish sufficient
12 minimum contacts in the other party's home forum, we believe the answer clearly is that it
13 cannot.")).

14 In *Burger King Corp.*, the Supreme Court held that a Michigan franchisee had
15 purposely availed himself of the privilege of conducting activities in Florida when the
16 franchisee "entered into a carefully structured 20-year relationship that envisioned continuing
17 and wide-reaching contacts with Burger King in Florida." *Burger King Corp.*, 471 U.S. at 480.
18 The franchise agreement required the franchisee's "voluntary acceptance of the long-term and
19 exacting regulation of his business from Burger King's Miami headquarters." *Id.* In
20 explaining why the Court of Appeals erred in holding that the Florida court did not have
21 personal jurisdiction over the franchisee, the Supreme Court stated: "we believe the Court of
22 Appeals gave insufficient weight to provisions in the various franchise documents providing
23 that all disputes would be governed by Florida law." *Id.* at 481.

24 In *Thomas P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*, 614
25 F.2d 1247 (9th Cir. 1980), plaintiff was an international grain trader based in California who
26 sold 15 shipments of grain to the defendant, a Costa Rican interest, and who purchased two
27 shipments of grain from the defendant, all over a four-year period. *See id.* at 1249. All
28 contracts specified delivery in Costa Rica and none of the shipments were delivered to or

originated from California. *See id.* The court found that plaintiff's California residency, the fact that plaintiff would suffer financial impacts in California, and the parties' use of the mail and telephone between California and Costa Rica were insufficient to establish the purposeful availment prong for California jurisdiction. *See id.* at 1253-54.

Based upon the uncontradicted allegations of the First Amended Complaint and the evidence presented by the parties, Checkgateway and the individual Defendants–while at all relevant times in Arizona–solicited and entered into a contract with Plaintiff, a California resident. This alone, is insufficient to constitute purposeful availment. *See Burger King Corp.*, 471 U.S. at 478; *Thomas P. Gonzalez Corp.*, 614 F.2d at 1254 ("The [defendant] validly argues that use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the state.") (citation omitted); *see also McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 816 (9th Cir. 1988) ("[N]o authorized agents of [defendant] were alleged to have performed or executed any portion of the contract in California. The parties conducted contract execution and termination by international mail. Such contacts are insufficient to constitute an act purposefully availing [defendant] of California laws."). The contract, *see* ECF No. 15-2 at 8-9, does not state that all disputes are to be governed by California law, *cf. Burger King Corp.*, 471 U.S. at 481, and does not mention California except when listing Plaintiff's mailing address. The contract does not provide that Plaintiff was required to perform any actions in California, or solicit any merchants in California. The seven-paragraph, two-page contract does not contain detailed provisions indicating "voluntary acceptance of the long-term and exacting regulation of [either party's] business." *Cf. id.* at 480.

The evidence indicates that this dispute does not include any merchants located in California. (Suppl. Bonfiglio Decl. ¶ 4; ECF No. 17-1; Kirchhefer Decl. ¶ 33, ECF No. 15-2; Bonfiglio Decl. ¶ 30, ECF No. 15-3). There is no evidence or allegation that Plaintiff solicited or referred any California-based merchant while performing the contract at issue. The allegations and evidence that Checkgateway does business with California businesses unrelated to the contract at issue are not sufficient to confer specific personal jurisdiction. *See*

1  *Goodyear Dunlop Tires Operations*, 131 S. Ct. at 2851 ("In contrast to general, all-purpose
2  jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or
3  connected with, the very controversy that establishes jurisdiction.") (quotation omitted); *cf.*
4  *Boschetto*, 539 F.3d at 1016 (for specific jurisdiction, "the claim must be one which arises out
5  of or relates to the defendant's forum-related activities"). The allegations and evidence that
6  Plaintiff performed its portion of the contract at its offices in California is likewise insufficient
7  to confer specific personal jurisdiction over Defendants. *See McGlinchy*, 845 F.2d at 816
8  ("'[Plaintiffs]' statement that they performed 90% of their activities in the Bay Area, even if
9  accurate, describes only unilateral activity.... [S]uch activity fails to create personal
10 jurisdiction over [defendant]."). The fact that Plaintiff is a California resident and Defendants'
11 alleged out-of-state actions caused a California resident injury is insufficient to confer personal
12 jurisdiction in a case sounding primarily in contract. *See Thomas P. Gonzalez Corp.*, 614 F.2d
13 at 1253 ("The [defendant] correctly notes that only its activities in California, and not
14 [plaintiff]'s, can supply the basis for jurisdiction. It is not sufficient that the plaintiff is a
15 California resident, or that an act outside California imposes an economic burden on a
16 California resident.") (citations omitted); *see also Gray & Co. v. Firstenberg Machinery Co.,*
17 *Inc.*, 913 F.2d 758, 760-61 (9th Cir. 1990) ("The foreseeability of causing injury in another
18 state is not a sufficient basis on which to exercise jurisdiction.") (citing *Burger King Corp.*,
19 471 U.S. at 474).

20       The Court concludes that Plaintiff has failed to satisfy its burden of showing that any
21 Defendant purposefully availed itself of the privilege of doing business in California. Plaintiff
22 has failed to satisfy its burden of establishing the first prong of the Ninth Circuit's three-prong
23 specific jurisdiction test. *See Boschetto*, 539 F.3d at 1016. Therefore, "the jurisdictional
24 inquiry ends." *Id*. ("[I]f the plaintiff fails at the first step, the jurisdictional inquiry ends....")
25 (quotation omitted).

26 **III.   Dismiss or Transfer the Action**

27       Having concluded that the Court lacks personal jurisdiction over Defendants, the Court
28 must determine whether to dismiss this action pursuant to the Federal Rule of Civil Procedure

12(b)(2) or transfer this action to another court pursuant to 28 U.S.C. § 1631. *See Pamplona ex rel. Pamplona v. Hernandez*, No. 08cv2205, 2009 WL 578578, at *3 (S.D. Cal., Mar. 5, 2009) (after concluding that the court did not have personal jurisdiction over two defendants, "[t]he Court must determine whether transfer [pursuant to § 1631] is more appropriate than dismissal"). "The transfer of civil actions among federal courts to cure jurisdictional defects is governed by 28 U.S.C. § 1631." *Cruz-Aguilera v. INS*, 245 F.3d 1070, 1074 (9th Cir. 2001). Section 1631 provides: "Whenever a civil action is filed in a court ... and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action ... to any other such court in which the action ... could have been brought at the time it was filed...." 28 U.S.C. § 1631. A § 1631 transfer is appropriate if "(1) the transferring court lacks jurisdiction; (2) the transferee court could have exercised jurisdiction at the time the action was filed; and (3) the transfer is in the interest of justice." *Cruz-Aguilera*, 245 F.3d at 1074; *see also id.* ("When determining whether transfer is in the interest of justice, courts have considered whether the failure to transfer would prejudice the litigant, whether the litigant filed the original action in good faith, and other equitable factors."); *Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990) ("Normally transfer will be in the interest of justice because normally dismissal of an action that could be brought elsewhere is 'time-consuming and justice-defeating.'") (quoting *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 467 (1962)).

In opposition to Defendants' motion, Plaintiff failed to address whether, in the event the Court found jurisdiction to be lacking, Plaintiff requests dismissal or transfer of this action to the District of Arizona pursuant to 28 U.S.C. § 1631. No later than ten days from the date this Order is filed, and without waiving any objections to this Order, Plaintiff may file a request for this action to be transferred to the District of Arizona. If Plaintiff does not file a request for this action to be transferred within ten days, the Court will dismiss this action without prejudice pursuant to Federal Rule of Civil Procedure 12(b)(2).

**IV. Conclusion**

IT IS HEREBY ORDERED that Plaintiff has failed to satisfy its burden of showing that this Court has personal jurisdiction over Defendants. The Motion to Dismiss remains pending.

No later than ten days from the date this Order is filed, and without waiving any objections to this Order, Plaintiff may file a request for this action to be transferred to the District of Arizona. If Plaintiff does not file a request for this action to be transferred within ten days, the Court will grant the Motion to Dismiss and dismiss this action without prejudice pursuant to Federal Rule of Civil Procedure 12(b)(2).

DATED: February 15, 2013

*William Q. Hayes*
**WILLIAM Q. HAYES**
United States District Judge